UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MUSKET CORPORATION,

                                   Plaintiff,

                   - against -

PDVSA PETROLEO, S.A., a/k/a PDVSA  PETROLEO
Y GAS, S.A., and ADVANCED ENGINEERING
DEVELOPMENT LTD.,

                                   Defendants.

Civil Action No.
**06 CV 15522 (VM)**

### MEMORANDUM OF LAW IN OPPOSITION TO
### PLAINTIFF MUSKET CORPORATION'S MOTION TO CONFIRM THE ATTACHMENT

CURTIS, MALLET-PRÉVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178
Telephone:       (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant*
PDVSA Petroleo, S.A.
(a/k/a PDVSA Petroleo y Gas, S.A.)

*Of counsel:*
    Benard V. Preziosi, Jr. (BP-5715)
    Lizabeth L. Burrell (LB-7980)
    Christopher C. Costello (CC-6516)

## TABLE OF CONTENTS

**Page #**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT................................................................................................2

STATEMENT OF FACTS ......................................................................................................5

ARGUMENT ....................................................................................................................14

I.    MUSKET HAS THE BURDEN OF PROVING THAT ALL STATUTORY REQUIREMENTS FOR ATTACHMENT HAVE BEEN SATISFIED, INCLUDING A SHOWING THAT MUSKET WILL PROBABLY SUCCEED ON THE MERITS ...............................14

II.   MUSKET CANNOT SHOW THAT IT WILL PROBABLY SUCCEED ON THE MERITS ......................................................................15

    A.   Musket Has Not Offered Any Evidence that Advanced Had Authority to Act for PDVSA ...........................................................15

        1.   It is the conduct of the principal, not the purported agent, that determines whether or not the agent possesses apparent authority ...............................................................................15

        2.   Musket has failed to present any evidence of words or conduct by PDVSA that could be reasonably interpreted to confer authority to bind PDVSA on Advanced, Intrakam, or anyone else ...............................................................................16

    B.   PDVSA's Rights as an Intended Third-Party Beneficiary Could Not Be Altered without its Consent................................................22

III.  MUSKET HAS NOT DEMONSTRATED A NEED FOR CONTINUING THE LEVY ...............................................................24

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

Page #

**Cases:**

Benedict v. Browne,
289 A.D.2d 433 N.Y.S.2d 404, 404 (2d Dep't 2001) ...........................................15

Collision Plan Unlimited, Inc. v. Bankers Trust Co.,
63 N.Y.2d 827 N.Y.S.2d 252, 253 (1984)....................................................21

Columbus Rose Ltd. v. New Millennium Press,
No. 02 CIV. 2634(JGK), 2002 WL 1033560 (S.D.N.Y. May 20, 2002) ..................23

FDIC v. Providence College,
115 F.3d 136 (2d Cir. 1997) ...............................................................21

Fleet Bank v. Consola, Ricciteli, Squadere Post No. 17, Inc.,
268 A.D.2d 627 N.Y.S.2d 182, 185 (3d Dep't 2000) ........................................21

Ford Motor Credit Co. v. Hickey Ford Sales, Inc.,
62 N.Y. 291 N.Y.S.2d 791, 795 (1984)......................................................15

Ford v. Unity Hospital,
32 N.Y.2d at 472 N.Y.S.2d at 244 .........................................................21

Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,
66 N.Y.2d 38 N.Y.S.2d 1, 5-6 (1985) .....................................................23

Gumpert v. Bon Ami Co.,
251 F.2d 735 (2d Cir. 1958) ..............................................................17

Hallock v. State of New York,
64 N.Y.2d 224 N.Y.S.2d 510, 513 (1984)..................................................16

Hiller Cranberry Prods., Inc. v. Koplovsky,
5 F. Supp. 2d 89 (N.D.N.Y. 1998).........................................................15

Indosuez Int'l Fin. B.V. v. National Reserve Bank,
98 N.Y.2d 238 N.Y.S.2d 631, 635 (2002)..................................................19

Karavos Compania Naviera S.A. v. Atlantica Export Corp.,
588 F.2d 1 (2d Cir. 1978)................................................................16

Karnell v. Mincieli,
81 A.D.2d 634 N.Y.S.2d 557 (2d Dep't 1981) ..............................................15

Lindenbaum v. Albany Post Prop. Assocs.,
297 A.D.2d 661 N.Y.S.2d 118, 120 (2d Dep't 2002) ........................................19

Morgold, Inc. v. ACA Galleries, Inc.,
    283 A.D.2d 407 N.Y.S.2d 447, 448 (2d Dep't 2001) ............................................... 19

N. Bloom & Son (Antiques) Ltd. V. Skelly,
    673 F. Supp. 1260 (S.D.N.Y. 1987) ...................................................................... 23

Perotta v. Giannoccaro,
    141 Misc. 2d 155 N.Y.S.2d 998, 1000 (Sup. Ct. Monroe Cty. 1988) ..................... 15

Rothman v. Rogers,
    221 A.D.3d 330 N.Y.S.2d 361, 361-62 (2d Dep't 1995) ........................................ 15

Silvestre v. De Loaiza,
    12 Misc. 3d 492 N.Y.S.2d 440, 445 (Sup. Ct. N.Y. Cty. 2006) .............................. 15

Standard Funding Corp. v. Lewitt,
    89 N.Y.2d 546 N.Y.S.2d 188, 191 (1997) ............................................................. 16

Wen Kron Realty Co. v. Public Nat'l Bank & Trust Co. of New York,
    260 N.Y. 84 (1932) .............................................................................................. 16

**Statutes:**

CPLR § 6211(b) .............................................................................................................. 14

CPLR § 6212(a) .............................................................................................................. 14

CPLR § 6223(b) .......................................................................................................... 14, 25

Benard V. Preziosi, Jr. (BP-5715)
Lizabeth L. Burrell (LB-7980)
Christopher C. Costello (CC-6516)

CURTIS, MALLET-PRÉVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178
Telephone:    (212) 696-6000
Facsimile:     (212) 697-1559

Attorneys for Defendant
PDVSA Petroleo, S.A. (a/k/a PDVSA Petroleo y Gas, S.A.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MUSKET CORPORATION,<br><br>                              Plaintiff,<br><br>             - against -<br><br>PDVSA PETROLEO, S.A., a/k/a PDVSA  PETROLEO<br>Y GAS, S.A., and ADVANCED ENGINEERING<br>DEVELOPMENT LTD.,<br><br>                              Defendants. | Civil Action No.<br>**06 CV 15522 (VM)** |

MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF MUSKET CORPORATION'S MOTION TO CONFIRM THE ATTACHMENT

Defendant PDVSA Petroleo, S.A. (a/k/a PDVSA Petroleo y Gas, S.A.)

("PDVSA") respectfully submits this memorandum of law in opposition to the motion by

plaintiff Musket Corporation ("Musket") to confirm this Court's Order of Attachment,

which was obtained by *ex parte* application on December 28, 2006.

### PRELIMINARY STATEMENT

To succeed on this motion, Musket bears the burden of demonstrating, among other things, that it will probably prevail on the merits. *See* Point I, *infra* at 14-15. To do so, it must come forward with persuasive factual evidence that *PDVSA* was not entitled to the $1,561,061.50 it drew on the letter of credit, not merely that Musket paid more than it claims was required under its contract with Advanced Engineering Development Ltd. ("Advanced") ("Advanced-Musket contract").

Musket, however, offers nothing more than a perfunctory recitation that it paid the total amount due under the Advanced-Musket contract, as amended; that PDVSA drew funds on a standby letter of credit with the result that PDVSA received more than the "approximately $14,430,000.00" that was payable to PDVSA under the Advanced-Musket contract; and therefore that Musket is out of pocket about $1.5 million. Even if true, however, those allegations do not answer the question of whether or not PDVSA had a right to draw on the letter of credit.[1]  As Musket admits, the answer to that question depends on whether or not PDVSA was bound by the Advanced-Musket contract.

Instead of evidence of PDVSA's knowledge of and consent to the Advanced-Musket contract—and there is none because PDVSA never saw the Advanced-Musket

---

1.    PDVSA has come forward with a wealth of documentary and testimonial evidence that the letter of credit was issued specifically to secure PDVSA's rights under an entirely different contract—one between PDVSA, as seller, and Intrakam SA de CV ("Intrakam"), as buyer ("PDVSA-Intrakam contract"); that it was the PDVSA-Intrakam contract, not the Advanced-Musket contract, that governed PDVSA's drawing rights under the letter of credit; and that under the PDVSA-Intrakam contract, the drawing was entirely proper.  *See* Statement of Facts *infra* at 6-14; Point II.A.2, *infra* at 16-22.

contract or learned of its terms—Musket offers two theories—agency and third-party beneficiary status—to bind PDVSA to the Advanced-Musket contract and its amendment lowering the amount payable to PDVSA. Musket has failed, though, to provide evidence that it will probably succeed on either of these theories.

On agency, Musket argues that Advanced, a Spanish company, had authority to bind PDVSA, a Venezuelan state-owned company, to the Advanced-Musket contract and particularly to an amendment to that contract which reduced the amount payable to PDVSA by about $1.3 million. Ravi Ramdas (Musket's sole factual affiant), however, *never identifies a single word or action by PDVSA* indicating that Advanced or anyone else had authority to act for PDVSA in any respect. *See* Affidavit of Ravi Ramdas dated January 15, 2007 ("Ramdas Aff.") ¶¶ 7-10; Point II.A.2, *infra* at 16-22. Instead, Mr. Ramdas admits that Musket relied entirely on Advanced's own assertions of its authority to act, without once confirming these assertions with PDVSA. *See id.* There is no evidence that PDVSA was even provided with the Advanced-Musket contract.

In contrast, PDVSA has come forward with evidence that it never gave Musket any reason to believe that Advanced or anyone else was PDVSA's agent and in fact repeatedly advised Musket that Intrakam was PDVSA's only contract partner with respect to the cargo at issue, that the only contract that PDVSA wanted to secure was the PDVSA-Intrakam contract, and that the letter of credit had to be designed and worded to provide for payment pursuant to the PDVSA-Intrakam contract. *See* Statement of Facts, *infra* at 9-12; Point II.A.2, *infra* at 19-20.

Musket's second theory is that PDVSA is a third-party beneficiary of the original Advanced-Musket contract and is bound by that contract's amendment reducing the amount payable to PDVSA by about $1.3 million.    While PDVSA rejects this characterization, assuming *arguendo* that PDVSA is a third-party beneficiary, PDVSA would not be bound by the amendment which constricted its rights unless PDVSA expressly agreed after PDVSA allowed the vessel to sail in reliance on the terms of the letter of credit. Musket has not offered any evidence that PDVSA consented to or even knew of any amendment to Musket's payment obligations under the Advanced-Musket contract. *See* Point II.B, *infra* at 22-24.

While attempting to tie PDVSA to agreements without evidence of PDVSA's knowledge of or consent to their provisions, Musket has neglected to inform the Court that it was Musket that instructed the bank about the terms of the letter of credit amendment under which PDVSA drew.  Those terms are that "this letter of credit is being issued relative to contract reference 015INTRAK covering the purchase of MT35,708 of D2 diesel oil *between PDVSA Petroleo S.A. and the company Intrakam*," not the Advanced-Musket contract, and that the applicant was "Musket Corporation *on behalf of the company Intrakam SA de CV*." Affirmation of Gilmer G. González G. dated February 1, 2007 ("González Aff.") Exhs. 50-51; Affirmation of Maria Gabriela Silva dated February 2, 2007 ("Silva Aff.") Exh. 60 (emphasis added).  Accordingly, the letter of credit secured PDVSA's right to payment under the PDVSA-Intrakam contract, not the Advanced-Musket contract, and PDVSA was entitled to draw on the letter of credit when it was not paid the full amount due from Intrakam.

Musket has failed to offer any evidence to the contrary, and such evidence as Musket has offered shows that Musket unreasonably relied solely on Advanced's assertions of its own authority to bind PDVSA. Such evidence falls woefully short of meeting Musket's burden of demonstrating that it will probably succeed on the merits.

## STATEMENT OF FACTS

Musket alleges that: (a) on an unspecified date in November 2006, Musket, as buyer, and defendant Advanced, as seller, entered into the Advanced-Musket contract, which provided that Musket would pay PDVSA about $15.7 million, Complaint ¶¶ 5-6, Ramdas Aff. ¶ 9; (b) PDVSA was a third-party beneficiary of the Advanced-Musket contract, Complaint ¶ 7; (c) to secure the rights of PDVSA as a third-party beneficiary under the Advanced-Musket contract, Musket secured a stand-by letter of credit dated November 14, 2006 naming PDVSA as the beneficiary, Complaint ¶ 8; and (d) the Advanced-Musket contract was amended on December 4, 2006 to provide for the payment of "approximately $14,430,000.00" to PDVSA. Complaint ¶ 11 & Exh. 3 thereto.

Because PDVSA was not a party to the Advanced-Musket contract and never saw the contract or its amendment or was advised of their terms, PDVSA knows nothing of those events, except what Musket has alleged in this suit. *See* González Aff. ¶¶ 2, 64-66, 73-74, 77. As for the rest of Musket's allegations, PDVSA agrees that Musket paid PDVSA $14,433,192.57 on December 19, 2006, Complaint ¶ 14; and that PDVSA later drew on the letter of credit in the amount of $1,561,061.50. Complaint ¶ 15.

The draw, however, was based on the fact that the amount PDVSA received from Musket was over $1.5 million short of what PDVSA was entitled to received under the PDVSA-Intrakam contract, which is the contract specifically secured by the letter of credit. *See generally* González Aff. & Exhs. 50-51; Silva Exh. 60. Although the PDVSA-Intrakam contract related to the same cargo that was the subject of the Advanced-Musket contract,[2] the PDVSA-Intrakam contract covered a transaction entirely distinct from the Advanced-Musket contract and has its own independent history. While the details of that history are important and are therefore set forth in the affirmation of Gilmer González, International Commerce General Manager of PDVSA's Commerce & Supply Department, an abbreviated version here will put Musket's allegations in context and demonstrate the lack of merit to Musket's claims.

PDVSA is a state-owned oil company that sells crude oil and refined products, including gasoil (also known as diesel). González Aff. ¶ 3. In order to minimize the risk of nonpayment and other problems, PDVSA sells only to its registered customers. González Aff. ¶¶ 5-7. Instructions for becoming a registered customer are highlighted on PDVSA's website and linked to prominent statements that PDVSA never does business through intermediaries. González Aff. ¶¶ 5-6.

On October 19, 2006,[3] PDVSA entered into the PDVSA-Intrakam contract under which Intrakam, a registered PDVSA customer, purchased a cargo of 240,000 barrels of

---

2.   As is common in the oil trade, the same cargo can be subject to multiple contracts, but each individual contract governs the rights of its parties, and only its own parties, without regard to any other contract in the chain. González Aff. ¶¶ 10.

3.   Unless otherwise specified, all dates are in 2006.

gasoil, plus or minus 10%, on F.O.B. terms.  González Aff. ¶¶ 15-16, 18 & Exh. 1 cls. 1, 2, 3.1-3.5.  As is typical in oil trading, the final price was fixed by reference to an industry index (Platt's) specific to the cargo's destination (Singapore) and during a certain time period (an average of the three days following the bill of lading date).  González Aff. ¶¶ 11-12 & Exh. 1 cl. 5.  Because a bill of lading is not issued until the cargo is loaded onto the vessel that will transport it, the final price could not be determined when PDVSA and Intrakam agreed to their contract.  González Aff. ¶¶ 13, 19.  Any change in the anticipated timing of the loading or destination of the cargo would produce a change in price.  See González Aff. ¶¶ 11-13, 17; Exh. 2 cl. 15.

Because the PDVSA-Intrakam contract was on F.O.B. terms, title and risk passed from PDVSA, as seller, to Intrakam, as buyer, as the cargo passed the rail of a vessel chartered by Intrakam.  González Aff. ¶ 16.  Accordingly, the PDVSA-Intrakam contract required Intrakam make a prepayment of the cargo's estimated value before it was loaded.  González Aff. ¶ 19 & Exh. 1 cl. 7.

On October 19, the date of the sale, Intrakam nominated and PDVSA accepted the vessel TEAM ANIARA to load this cargo and PDVSA issued an invoice to Intrakam for the prepayment which was payable the following day, October 20.  González Aff. ¶¶ 20-21 & Exhs. 3-5.  When the vessel tendered her notice of readiness to load on October 23, however, Intrakam still had not made the required prepayment.  González Aff. ¶ 22 & Exh. 6.

Without the prepayment, PDVSA was not obligated to load.  González Aff. ¶ 23 & Exh. 1 cl. 7.  At this time, though, PDVSA's shore tanks containing gasoil were filled

to capacity, and unless room was made to accept new product, PDVSA's refinery would have had to shut down production, a very costly measure. González Aff. ¶¶ 23-24. No other vessels were scheduled to load gasoil, and so, without other means to relieve the shore tanks of product and relying on Intrakam's assurances that payment was imminent, PDVSA decided on October 25 to load the vessel but to withhold the cargo documents necessary for the vessel to sail until the prepayment was received. González Aff. ¶¶ 24, 27-28 & Exhs. 7-8.

Loading was completed on October 27, but because Intrakam still had not paid the vessel remained at the loadport. González Aff. ¶¶ 28-32, 35 & Exhs. 6, 12-17. After more excuses and assurances, Intrakam announced on November 2 that Intrakam's onward sale of the cargo to another party had fallen through and that Intrakam would have to look for another company to buy the cargo from Intrakam in order to fund Intrakam's obligations under the PDVSA-Intrakam contract. González Aff. ¶¶ 35-44 & Exhs. 16-29. Of course, each day the vessel accumulated more demurrage for her waiting time in port, adding significantly to the transaction costs for Intrakam. González Aff. ¶¶ 35, 41.

Over the next week, PDVSA continued to press for payment and Intrakam kept stalling. González Aff. ¶¶ 45-48 & Exhs. 30-32.

After still another onward sale by Intrakam failed, late on Friday, November 10, Intrakam indicated that PDVSA would be receiving a letter of credit to secure payment for this cargo and that Intrakam was guaranteeing the demurrage. González Aff. ¶¶ 50 & Exh. 33. PDVSA promptly supplied Intrakam with PDVSA's preferred form for letters of credit. González Aff. ¶¶ 51-52 & Exhs. 34-35. That form is for a "stand-by" letter of credit to

function as security in case the customer does not pay the amount due rather than to be the payment method in the first instance. González Aff. ¶ 53 & Exh. 35.

On Monday, November 13, PDVSA accepted Intrakam's proposal to change the cargo's destination from Singapore to Houston, gave Intrakam information about price based on the new destination, and asked Intrakam to provide information necessary for issuing new cargo documents. González Aff. ¶¶ 54-55 & Exh. 36. Intrakam supplied this information, naming Musket as the new consignee. González Aff. ¶ 54 & Exhs. 37-38.

Intrakam asked PDVSA to contact Musket concerning the required documentary and logistical information and Musket contacted PDVSA directly, but PDVSA's response to all of this was to reply to Intrakam, and Intrakam only, that Intrakam alone was PDVSA's customer and that PDVSA would communicate only with Intrakam concerning the arrangements for this cargo. González Aff. ¶¶ 56-58 & Exhs. 40-42.

On the afternoon of November 14, PDVSA's letter of credit analyst, María Gabriela Silva, received a fax from JPMorgan Chase bank attaching a letter of credit naming Musket as the applicant and describing the drawing documents. González Aff. ¶ 60 & Exh. 44. Because Ms. Silva could not associate this letter of credit with a transaction, she tried phoning the bank but was unable to reach anyone to clarify the situation. González Aff. ¶ 60. Ms. Silva later received a copy of this same letter of credit from Intrakam and so was able to connect the document with the PDVSA-Intrakam contract. González Aff. ¶ 61

Nevertheless, the proffered letter of credit was unacceptable to PDVSA, primarily because of the references to Musket rather than Intrakam as the applicant and in

the failure to identify the contract being secured.  González Aff. ¶ 61 & Exh. 44.  Ms. Silva advised Intrakam that because PDVSA had no commercial relationship with Musket and Intrakam was PDVSA's only client in this transaction, Intrakam had to be substituted for Musket as the applicant and other appropriate changes had to be made.  González Aff. ¶ 61 & Exh. 45.

On November 15, Intrakam proposed changes that did not resolve PDVSA's concerns, so a conference call was held among PDVSA, Intrakam, Musket, and Advanced Engineering.  González Aff. ¶¶ 62-64 & Exhs. 45-47.  During this conversation, Mr. González, PDVSA's International Commerce General Manager, explained that Intrakam and only Intrakam was PDVSA's customer and therefore that PDVSA needed a letter of credit securing Intrakam's obligations under the PDVSA-Intrakam contract.  González Aff. ¶ 64 & Exh. 48.  At no time during this conversation did any participant suggest that PDVSA had a contract with anyone other than Intrakam and the terms of any contract to which Musket was a party were not discussed.  González Aff. ¶¶ 65-66.  In fact, PDVSA was completely unaware of the existence or terms of the Advanced-Musket contract and remained so until the Complaint was received. González Aff. ¶¶ 2, 64-66, 73-74, 77.

Mr. González' message confirming the substance of the discussion reiterates that PDVSA required amendments to the letter of credit because "Intrakam is the registered

client of PDVSA, the actual direct buyer and responsible for paying before PDVSA."[4]
González Exh. 48.

Musket sent instructions to the bank to amend the letter of credit based on PDVSA's requirements, but these instructions were not entirely satisfactory to the bank, which had not participated in the November 15 call. *See* González Exh. 49. The bank advised Musket that "a letter of credit is an independent undertaking," and that it therefore was necessary to identify the "underlying contract" pursuant to which payment was to be made. González Exh. 49 From Musket's instructions, the bank understood that the letter of credit secured the PDVSA-Intrakam contract and suggested that the underlying transaction be identified as the contract "covering the purchase of MT35,708 of D2 Diesel Oil *between PDVSA Petroleo [y Gas] S.A. and Intrakam*" or similar language. González Exh. 49 (emphasis added).

An amended letter of credit was issued on November 17. González Aff. ¶¶ 68 & Exhs. 50-51. It named "Musket Corporation on behalf of the Company Intrakam" as the applicant and stated that "this letter of credit is issued relative to contract reference

---

4.    As discussed below, see Point II.A.2, *infra* at 19-20, even though this message says nothing more than that Intrakam was PDVSA's only customer and that the letter of credit needed to reflect that fact, Musket relies *solely* on the conference call and mere presence of "a.engineering@terra.es" among other "cc" addresses in the follow-up e-mail for its astonishing assertion that PDVSA "was fully aware of Advanced's role in this transaction." Ramdas Aff. ¶¶ 12-14. Tellingly, despite Musket's burden of proof, Musket did not submit any evidence from the Musket representative who participated in this call and received the November 15 confirming message. PDVSA's Mr. González, who did take part and who sent the message, has stated unequivocally that PDVSA never saw the Advanced-Musket contract and that Advanced's role in this transaction was unknown to PDVSA. González Aff. ¶¶ 2, 64-66, 73-74, 77.

015INTRAK covering the purchase of MT35,708 of D2 diesel oil between PDVSA Petroleo

S.A. and the company Intrakam SA de CV." González Exhs. 50-51; Silva Exh. 60. PDVSA

accepted the amendments. Silva Aff. ¶ 21 & Exh. 60; González Aff. ¶ 60. The amount of the

letter of credit remained "$16,400,000.00 plus +/- 10%." González Exhs. 50-51; Silva Exh. 60.

  With satisfactory security for Intrakam's payment obligations under the

PDVSA-Intrakam contract, PDVSA provided the cargo documents and the vessel sailed on

November 19. González Aff. ¶ 69 & Exhs. 6, 52. All of the cargo documents issued by

PDVSA show Houston as the destination. González Exh. 52. Unbeknownst to PDVSA,

however, the cargo was evidently sent to Antwerp rather than Houston, the destination to

which PDVSA had agreed.[5] *See* Complaint ¶ 12; González Aff. ¶ 77.

  Also unbeknownst to PDVSA, on December 4, Musket agreed with Advanced

to amend the Advanced-Musket contract (of which PDVSA was unaware in the first place) to

reduce the amount payable to PDVSA. Complaint Exh. 3; González Aff. ¶¶ 2, 64-66, 73-74,

77. It appears that this amendment was made so that Musket would pay the loadport

demurrage to the vessel owner, which was refusing to discharge the cargo unless it received its

compensation. Ramdas Aff. ¶ 8.

  By that time, Musket itself had doubts about Advanced's authority since

Musket felt it needed "assurances" that Advanced was authorized. *See* Ramdas Aff. ¶ 10.

---

5. The value of oil products varies geographically. González Aff. ¶¶ 11. Accordingly, PDVSA's contracts require PDVSA's express consent to any change in destination, buyers are required to provide follow-up information after discharge, and PDVSA's Standard Terms and Conditions always key the final price to the actual destination. González Aff. ¶¶ 11-13, 17; Exh. 2 cl. 15.

Musket admits, however, that it sought and relied entirely upon the representations of *Advanced, not PDVSA*, for assurance that Advanced was authorized to change the amount to be paid PDVSA from about $15.7 million to about $14,430,000. Ramdas Aff. ¶ 10; *see also id.* ¶¶ 7-9 (no mention of any communication or action by PDVSA indicating that Advanced or Intrakam was PDVSA's agent); Point II.A.2, *infra* at 16-22. Musket nowhere contends that it sought PDVSA's consent or even advised PDVSA about these developments.

Ignorant of these events and transactions, on December 12, PDVSA invoiced Intrakam in the amount of $15,992,694.88 in accordance with the PDVSA-Intrakam contract based on a Houston destination, which is where PDVSA believed the cargo had gone and which was the only destination to which PDVSA had agreed. González Aff. ¶¶ 74-75, 77 & Exh. 55; *see* González Exh. 52.

At some point Musket received an undated invoice from Advanced in the amount of $14,433,192.57. *See* Silva Aff. ¶ 20 & Exhs. 58-59. Evidently, Musket also received a copy of PDVSA's December 12 invoice to Intrakam. Musket's Betty Proudfoot contacted PDVSA's Ms. Silva about the difference between these two amounts. Silva Exhs. 57-59. After Ms. Silva explained that PDVSA was entitled to the full amount of its invoice, Ms. Proudfoot said that Musket would wire PDVSA the amount stated in the Advanced invoice and that PDVSA could draw on the letter of credit for the balance. Silva Aff. ¶¶ 20.

PDVSA received a wire transfer from Musket in the amount of $14,433,192.57 to PDVSA by a wire transfer with the text to beneficiary reading "payment under letter of credit No. CTCS-651908 Musket Corporation on behalf of Intrakam SA de CV, INV

383222-0," Ramdas Exh. 3, which is the number of PDVSA's final December 12 invoice to

Intrakam.  González Aff. Exh. 55.  Because that letter of credit, as amended on November 17,

provided that "[t]he amount for drawing under this letter of credit will be reduced by the

amount of any payments outside of this letter of credit to the beneficiary [PDVSA] if such

payments are made through JPMorgan Chase Bank, N.A., Chicago and reference this letter of

credit," PDVSA drew only the balance of $1,559,502.31 due under the PDVSA-Intrakam

contract, plus two days' interest amounting to $1,559.19, for a total draw of $1,561,061.50.

Silva Aff. ¶¶ 23-25 & Exh. 60; González Exhs. 50-51.

PDVSA was fully entitled to the draw it made under the terms of both the

PDVSA-Intrakam contract and the "independent undertaking" of the letter of credit.

González Aff. ¶ 78 & Exhs. 49-51.


ARGUMENT

I.      MUSKET HAS THE BURDEN OF PROVING
        THAT ALL STATUTORY REQUIREMENTS FOR
        ATTACHMENT HAVE BEEN SATISFIED,
        INCLUDING A SHOWING THAT MUSKET WILL
        PROBABLY SUCCEED ON THE MERITS.

Taken together, CPLR §§ 6211(b), 6212(a), and 6223(b)  provide that on a

motion to confirm, "the plaintiff shall have the burden of establishing the grounds for

attachment, the need for continuing the levy and the probability that he will succeed on the

merits" by affidavit and written evidence.  *See, e.g., Karnell v. Mincieli*, 81 A.D.2d 634, 440

N.Y.S.2d 557 (2d Dep't 1981). *Ford Motor Credit Co. v. Hickey Ford Sales, Inc.*, 62 N.Y. 291,

301, 476 N.Y.S.2d 791, 795 (1984).

To show a probability of success, "there must be something in the proof stronger than the mere *prima facie* case that could satisfy in a pleading." *Perotta v. Giannoccaro*, 141 Misc. 2d 155, 157, 532 N.Y.S.2d 998, 1000 (Sup. Ct. Monroe Cty. 1988) (quoting David D. Siegel, NEW YORK PRACTICE § 316 (4th ed. 2005)); *accord Benedict v. Browne*, 289 A.D.2d 433, 433, 375 N.Y.S.2d 404, 404 (2d Dep't 2001) ("moving papers must contain evidentiary facts as opposed to conclusions").

Showing a "probability" of success imposes an even higher burden than showing a "likelihood" of success. *Silvestre v. De Loaiza*, 12 Misc. 3d 492, 499, 820 N.Y.S.2d 440, 445 (Sup. Ct. N.Y. Cty. 2006). Accordingly, attachments are routinely vacated where the plaintiff has failed to show the probability that it will prevail on the underlying claim. *See, e.g., Rothman v. Rogers*, 221 A.D.3d 330, 633 N.Y.S.2d 361, 361-62 (2d Dep't 1995); *Hiller Cranberry Prods., Inc. v. Koplovsky*, 5 F. Supp. 2d 89, 91 (N.D.N.Y. 1998).

## II.    MUSKET CANNOT SHOW THAT IT WILL PROBABLY SUCCEED ON THE MERITS.

### A.    Musket Has Not Offered Any Evidence that Advanced Had Authority to Act for PDVSA.

1.  It is the conduct of the principal, not the purported agent, that determines whether or not the agent possesses apparent authority.

"The power of the agent results from manifestation of the principal's consent, and extends no further than such manifestation." *Wen Kron Realty Co. v. Public Nat'l Bank & Trust Co. of New York*, 260 N.Y. 84, 89 (1932).

Accordingly, apparent authority to bind a principal cannot be created by the words or conduct of the purported agent. Instead, apparent authority is only created by

"words or any other conduct of the *principal* which, *reasonably interpreted,* causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." RESTATEMENT (SECOND) OF AGENCY § 27 (1958) (emphasis added); *Standard Funding Corp. v. Lewitt,* 89 N.Y.2d 546, 551, 656 N.Y.S.2d 188, 191 (1997) (quoting *Hallock v. State of New York,* 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513 (1984)).

Because the appearance of authority must be created by the principal, apparent authority cannot be conferred through "the unauthorized acts, representations or conduct of the agent." *Ford v. Unity Hospital,* 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 244 (1973); *accord Hallock,* 64 N.Y.2d at 231, 485 N.Y.S.2d at 513 ("The agent cannot by his own acts, imbue himself with apparent authority."); *Karavos Compania Naviera S.A. v. Atlantica Export Corp.,* 588 F.2d 1, 10 (2d Cir. 1978) ("The agent cannot confer authority upon himself or make himself agent simply by saying that he is one."); *Gumpert v. Bon Ami Co.,* 251 F.2d 735, 739 (2d Cir. 1958) ("unauthorized representations of the agent are not a holding out by the principal and cannot be a basis for apparent authority").

2.    **Musket has failed to present any evidence of words or conduct by PDVSA that could be reasonably interpreted to confer authority to bind PDVSA on Advanced, Intrakam, or anyone else.**

The only "evidence" proffered by Musket to sustain its contention that PDVSA was bound by the original Advanced-Musket contract or its amendment is an affidavit from Mr. Ramdas asserting that:

- The heading of the Advanced-Musket contract appears to identify Advanced as an "Intrakam/PDVSA Operator," but Mr. Ramdas admits that "[t]he contract

was prepared by *Advanced.*" Ramdas Aff. ¶ 7 (emphasis added). Conspicuously lacking is any allegation that PDVSA consented to the use of its name in any form, took part in the preparation of this contract, was provided with a copy or even knew of its existence.

- "*Plaintiff was told* that Intrakam was an agent or broker of PDVSA handling sales to foreign, private (non-governmental) entities, and that Advanced was acting for Intrakam and PDVSA." Ramdas Aff. ¶ 7 (emphasis added). Musket does *not* allege *PDVSA* made this representation and in fact, no one at PDVSA said any such thing. González Aff. ¶¶ 2, 65.

- "*Advanced* asked plaintiff to pay [the vessel's] invoice, as an accommodation to Advanced . . . [and] *Plaintiff and Advanced agreed* that this sum was to be credited toward the purchase price of the cargo [so that] the balance due by plaintiff to Advanced and PDVSA would be reduced by that amount." Ramdas Aff. ¶ 8 (emphasis added). There is no allegation that PDVSA in any way indicated consent to or even knew of this or any other arrangement between Advanced and Musket, and in fact, PDVSA did not know of and had no reason to know of the existence or terms of the original Advanced-Musket or its amendment. González Aff. ¶ 73.

- "*Advanced* then prepared the contract amendment . . . . *Advanced* did not reveal to [Musket] the basis for the change in the allocation of the sales price between itself and PDVSA." Ramdas Aff. ¶ 9 (emphasis added). Again,

Musket does not contend that PDVSA was advised of or in any way communicated its assent to any of Advanced's actions.

- "Musket was *advised by Advanced* that there was no need to contact PDVSA with regard to the contract amendment. Musket was assured that Advanced acted with full authority." Ramdas Aff. ¶ 10 (emphasis added). Notably absent is any allegation that Musket was assured by the *purported principal, PDVSA,* that Advanced was allowed to reduce the amount payable to PDVSA. Reliance on such "assurance" from Advanced is all the more unreasonable since some degree of suspicion that Advanced was not acting with authority must have triggered Musket's request for reassurance on that score.[6]

Simply put, Musket never bothered checking with PDVSA to see what, if any, relationship existed between Advanced and PDVSA. In fact, there was none. González Aff. ¶¶ 64-65. As in *Morgold, Inc. v. ACA Galleries, Inc.*, 283 A.D.2d 407, 408, 724 N.Y.S.2d 447, 448 (2d Dep't 2001), it is "especially true" that third parties cannot rely on statements of a purported agent as to the agent's authority where the third party fails to make "reasonable inquiries into the ostensible agent's actual authority." *Accord Indosuez Int'l Fin. B.V. v. National Reserve Bank*, 98 N.Y.2d 238, 246, 756 N.Y.S.2d 631, 635 (2002); *Lindenbaum v. Albany Post Prop. Assocs.*, 297 A.D.2d 661, 663, 747 N.Y.S.2d 118, 120 (2d Dep't 2002).

---

6.    Musket's cagey statement can mean only one of two things: Either Musket asked if it should contact PDVSA and was told that such contact was unnecessary or Advanced volunteered its "assurance" without being asked. In either case, the only reasonable inference is that there were serious doubts about Advanced's authority.

Musket also contends that a November 15 telephone conference and e-mail message confirming that conversation establish that "PDVSA was fully aware of Advanced's role in the transaction," Ramdas Aff. ¶¶ 12-14, but Musket does not provide the substance of any alleged statement concerning "Advanced's role in the transaction" that was made either during the phone call or in the e-mail. That Advanced and PDVSA were both parties to a phone call and that follow-up correspondence was copied to all parties does not establish anything about what any party understood about the other parties' roles and transactions. Moreover, Musket's affiant did not participate in and does not even describe second-hand the discussions that took place during that call.

Apart from the fact that Musket offers no evidence indicating that PDVSA knew anything about Advanced's representations or conduct, the only competent proofs about what was said and what PDVSA was aware of as a result of that conference are the e-mail itself, Ramdas Exhibit 7 and González Exhibit 48, and the affirmation of PDVSA's International Commerce General Manager, who did participate. Mr. González has declared without qualification:

> During this conversation, nobody said or suggested that Intrakam was anything other than the direct purchaser of the cargo from PDVSA and PDVSA's registered client. Nobody said or suggested that Intrakam, Advanced Engineering, or any other company or person was an agent of PDVSA. Neither I nor any other PDVSA participant was asked about Advanced Engineering or its role in the transaction which, as stated previously, was something about which we were unaware.
>
> During this November 15, 2006 conversation, Betty Proudfoot, representing Musket, never mentioned any of Musket's

contractual relationships with Intrakam, Advanced Engineering, or anyone else.

González Aff. ¶¶ 65-66.

Mr. González's follow-up e-mail summarizing the discussion stated that "Intrakam is the registered client in PDVSA, the actual direct buyer and responsible for paying before PDVSA." González Aff. ¶¶ 64 & Exhs. 48, 49.

Even without Mr. González' testimony, that message alone demonstrates that Musket is entirely disingenuous in alleging that the telephone call and message "establish that PDVSA was fully aware of Advanced's role in the transaction," especially in leaving the "transaction" unidentified since Musket has offered no evidence that there was even any mention of the Advanced-Musket contract during this call, the purpose of which was to ensure payment under the PDVSA-Intrakam contract and to modify the letter of credit to make that clear.

Musket's accusation that "some sort of legal fiction" (Ramdas Aff. ¶ 12) influenced PDVSA's commercial transactions demonstrates that Musket has not bothered to take any reasonable step to determine whether or not Advanced had the right to bind PDVSA, a state-owned company. All Musket had to do was plug "PDVSA" into a search engine to learn everything about how to do business with PDVSA and to learn that "Product sales take effect between the provider and the client directly, with no intermediaries (third parties, representatives, etc)." González Aff. ¶¶ 5-6 (depicting http://www.pdvsa.com/).

In New York, "a third party 'who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority.'" *FDIC v.*

*Providence College*, 115 F.3d 136 (2d Cir. 1997); *accord Ford v. Unity Hospital*, 32 N.Y.2d at 472, 346 N.Y.S.2d at 244; *Collision Plan Unlimited, Inc. v. Bankers Trust Co.*, 63 N.Y.2d 827, 830, 482 N.Y.S.2d 252, 253 (1984) ("By invoking the doctrine of apparent authority to justify the propriety of its actions the [plaintiff] concomitantly assumed a duty of reasonable inquiry as to [the agent's] actual perimeter of authority."). The duty to inquire as to the scope of a purported agent's authority arises when "the facts and circumstances are such as to put him on inquiry . . . ." *Collision Plan*, 63 N.Y.2d at 830, 482 N.Y.S.2d at 253. Relying on confirmation from a purported agent as to the extent of his authority does not satisfy plaintiff's duty of inquiry. *See Fleet Bank v. Consola, Ricciteli, Squadere Post No. 17, Inc.*, 268 A.D.2d 627, 630, 701 N.Y.S.2d 182, 185 (3d Dep't 2000) (plaintiff's reliance on corporate resolutions signed by the purported agent regarding the extent of the purported agent's authority "did not provide a reasonable basis for plaintiff to conclude that [the agent] was cloaked with actual or apparent authority").

Musket has not made any allegation that PDVSA said anything or conducted itself in a way that would make it reasonable to believe that Advanced or anyone else was PDVSA's authorized agent. Instead, Musket admits agreeing to a letter of credit specifically securing payment under a contract between PDVSA and Intrakam and receipt of a message confirming that Intrakam was PDVSA's only contract partner. *See* Ramdas Aff. ¶ 12 & Exh. 7; González Exhs. 49-51.

Even viewing the state of affairs in a manner favorable to Musket, there can be no doubt that Musket was treading in an area of uncertainty. PDVSA made it clear that its

relationship was with Intrakam. Musket's bank expressly advised Musket to address "what and to whom is your recourse in the event of non-delivery or wrongful drawing" in connection with amending the letter of credit. González Aff. ¶ 67 & Exh. 49. With this uncertainty (at best) and with Musket's own apparent need for reassurance about whether or not Advanced was authorized to act for PDVSA, *see* Ramdas Aff. ¶ 10 & n.6, *supra* at 18, Musket clearly had a duty to ask the purported principal, PDVSA, if Advanced had authority to act on PDVSA's behalf.

PDVSA did nothing to create or confirm the idea that Advanced or Intrakam were its agents. González Aff. ¶¶ 2, 65. PDVSA did everything possible to make it clear that PDVSA was a party to a single contract and that the contract was with Intrakam alone. González Aff. ¶ 64. While Musket relies on agency theory in its attempt to bind PDVSA to the Advanced-Musket contract and the sum stated in its amendment, Musket has failed to allege a colorable factual predicate to support a reasonable belief that Advanced was authorized. Accordingly, Musket cannot shown that it has any possibility of succeeding on the merits and certainly has not demonstrated show that a decision in Musket's favor is probable.

B.    **PDVSA's Rights as an Intended Third-Party Beneficiary Could Not Be Altered without its Consent.**

Musket argues that PDVSA is a third-party beneficiary of the Advanced-Musket contract and is bound by the amendment to that contract reducing the amount payable to PDVSA. Parties to a contract with an intended third-party beneficiary cannot,

however, modify the contract's terms to the detriment of the third-party beneficiary if that beneficiary has materially changed its position in justifiable reliance on the original contract terms. *See* RESTATEMENT (SECOND) OF CONTRACTS § 311(3) (1981); *see Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44-46, 495 N.Y.S.2d 1, 5-6 (1985); *N. Bloom & Son (Antiques) Ltd. V. Skelly*, 673 F. Supp. 1260, 1267 (S.D.N.Y. 1987); *Columbus Rose Ltd. v. New Millennium Press*, No. 02 CIV. 2634(JGK), 2002 WL 1033560 (S.D.N.Y. May 20, 2002).

Musket claims that the Advanced-Musket contract requires Musket to establish a stand-by letter of credit in PDVSA's favor "to secure the rights of PDVSA as a third-party beneficiary" of that contract. Complaint ¶¶ 7-8 & Exh. 1. The resulting letter of credit, as amended, gave PDVSA a right to draw "$16,400,000.00 plus +/- 10%" to ensure it would receive full payment under the contract "between PDVSA Petroleo S.A. and the company Intrakam." González Aff. ¶ 68 & Exhs. 50-51. Accordingly, under Musket's own analysis, when PDVSA changed its position in reliance on the amended letter of credit required by the Advanced-Musket contract by allowing the vessel to sail away with a cargo for which PDVSA had not yet been paid, *see* González Aff. ¶¶ 69 & Exhs. 50-51, 54, PDVSA's rights could not be modified without its express consent.

To overcome this obstacle, Musket falls back on its argument that Advanced was authorized to consent to the Advanced-Musket contract amendment that reduced the amount payable to PDVSA. As shown above, however, there was no reasonable basis for Musket to believe that Advanced had authority to do so and Musket never asked PDVSA if

Advanced was authorized. Accordingly, characterizing PDVSA as a third party-beneficiary does not provide a basis for restricting PDVSA's drawing rights under the letter of credit.

PDVSA's position is that the source of its right to draw on the letter of credit—an "independent undertaking" in the words of Musket's bank—was the PDVSA-Intrakam contract, as demonstrated by the letter of credit's provision that it was covering payment under the PDVSA-Intrakam contract. Nevertheless, Musket's characterization of PDVSA as a third-party beneficiary of the Advanced-Musket contract did not bind PDVSA to receive a reduced sum because PDVSA's rights could not be altered after it changed its position in reliance on the letter of credit and Musket had no reasonable basis for believing that Advanced was authorized to agree on PDVSA's behalf to reduced compensation. Accordingly, even under Musket's third-party beneficiary theory, Musket has failed to show any chance of succeeding on the merits.

### III.    MUSKET HAS NOT DEMONSTRATED A NEED FOR CONTINUING THE LEVY.

Musket has made no attempt whatsoever to show that a judgment against PDVSA would go unsatisfied or that PDVSA would default on any obligation. Moreover, Musket has already found its way to PDVSA's bank account. Accordingly, there is no evidence that Musket has demonstrated a continuing need for the levy, as it is required to do to maintain the attachment. *See* CPLR § 6223(b).

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Confirm Order of Attachment should be denied, and the attachment should be vacated in its entirety.

Dated:     February 2, 2007
           New York, New York

                        Respectfully submitted,
              CURTIS, MALLET-PRÉVOST, COLT & MOSLE LLP


                    By _Lizabeth L. Burrell_
                        Lizabeth L. Burrell (LB-7980)
                           101 Park Avenue
                        New York, New York 10178
                        Telephone:    (212) 696-6000
                        Facsimile:    (212) 697-1559

                        *Attorneys for Defendant*
            PDVSA PETROLEO, S.A. (A/K/A PDVSA PETROLEO Y GAS, S.A.)

Of counsel:   Benard V. Preziosi, Jr.
              Christopher C. Costello