UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MUSKET CORPORATION,

                Plaintiff,

- against -

PDVSA PETROLEO, S.A., a/k/a PDVSA
PETROLEO Y GAS, S.A., and ADVANCED
ENGINEERING DEVELOPMENT LTD.,

                Defendants.

Civil Action No.
06 CV 15522 (VM)

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF ITS MOTION TO CONFIRM ATTACHMENT ORDER**

HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007
(212) 513-3200

Attorneys for Plaintiff

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................ 1

Statement of Facts ...................................................................................................... 1

ARGUMENT ............................................................................................................. 4

    I.    There Is Sufficient Evidence That Advanced Engineering Had Apparent Authority To Act For PDVSA, To Support An Attachment Order Based On Breach Of Contract ............................................. 4

    II.    Musket Did Not Agree, After The Fact, To Pay The Amount Claimed By PDVSA ................................................................................. 7

    III.    PDVSA Has Made No Showing That It Has Assets In The Jurisdiction That Might Satisfy A Judgment ........................................... 7

CONCLUSION .......................................................................................................... 8

## TABLE OF AUTHORITIES

Page

Cases

*Alicia Ocean Transp., S.A. v. Rollins Burdick Hunter*,
   621 F. Supp. 479 (S.D.N.Y. 1985) .................................................................. 6

*DIC Animation City, Inc. v. McNaught Syndicate, Inc.*,
   No. 92-CV-4859 (CSH), 1993 WL 535064 (S.D.N.Y. Dec. 21, 1993) .......... 7

*J.M. Heinike Associates, Inc. v. McCombs*,
   83 A.D.2d 751, 443 N.Y.S.2d 512 (4th Dep't 1981) ..................................5, 6

*Trustees Of the Am. Fed'n of Musicians and Employers' Pension Fund v.*
   *Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503 (S.D.N.Y. 1999) .................... 5

Statutes and Rules

Rule 64, Fed. R. Civ. P. ........................................................................................... 1

N.Y. CPLR § 6211(b) .............................................................................................. 1

Other Authorities

*Restatement (2d) Agency § 94* ............................................................................... 5

**Preliminary Statement**

Plaintiff Musket Corporation ("Musket") submits this Reply Memorandum of Law in support of its motion to confirm this Court's Order of Attachment entered on December 28, 2006 (the "Attachment Order"), pursuant to Rule 64 of the Federal Rules of Civil Procedure and Section 6211(b) of the New York Civil Practice Law and Rules ("CPLR"). Filed herewith in further support of Musket's motion are the reply affidavits of Ravi Ramdas and Betty Proudfoot, both sworn to on March 1, 2007.

**Statement of Facts**

In opposition to this motion, defendant PDVSA Petroleo, S.A. ("PDVSA") makes a detailed presentation concerning a multitude of facts that are internal to PDVSA and were largely unknown to Musket until these papers were filed. *See* the Affirmation of Gilmer Gonzales dated February 1, 2007 ("Gonzalez Aff."), and the Declaration of Maria Silva dated February 2, 2007 ("Silva Decl."), submitted by PDVSA.

Distilling this mass of detail, certain salient points appear that support confirmation of the Attachment Order.

The reason this transaction is unusual, and the principal reason why there is <u>any</u> dispute concerning the amounts to be paid, is that extraordinary demurrage charges ($825,000) were incurred as the fully-loaded vessel *Team Aniara* lay in port in Venezuela, for several weeks, without a purchaser for the cargo. We now learn that <u>this extraordinary situation was created by PDVSA, purely for its own internal reasons and for its own benefit</u>. PDVSA's witness reveals that, despite the agreement of Intrakam S.A. to pay for the cargo in full before it was loaded on the vessel, Intrakam failed to pay when due.[1] Gonzalez Aff., ¶ 22 and following.

---

[1] This despite PDVSA's claim that it sells only to "registered clients" such as Intrakam, in order to assure itself of the *bona fides* of its purchasers and to minimize the risk of nonpayment. Gonzalez Aff. ¶ 5.

Notwithstanding this total breach of their purchase agreement, PDVSA went ahead and loaded the cargo on board ship, including the "extra" ten percent allowed under the contract with Intrakam, in order to make room in its shore tanks for additional product and to avert a shutdown of its refinery, but it prevented the vessel from sailing. *Id.* ¶¶ 24, 26, 32. In other words, PDVSA commandeered the vessel as a floating storage tank, for its own purposes and benefit, yet it seeks to foist upon others the demurrage charges imposed by the vessel owner.

Given these circumstances, it is apparent that PDVSA was desperate to sell the cargo. Mr. Gonzalez recounts a series of failed transactions leading to the sale of the cargo to Musket, including the initial failure of Intrakam to pay for the cargo, and the involvement of two other potential end-buyers, Wintek International (Gonzalez Aff. ¶ 25 and Exh. 9) and Dynoil LLC (*id.* ¶ 45 and Exh. 30).

PDVSA repeatedly states that it was not aware of the contract between Musket and Advanced Engineering (*see* Complaint, Exh. 1), and it states that it had no idea of Advanced Engineering's role in the sale of the cargo to Musket. Mr. Gonzalez states that, as of the November 15, 2006 conference call to discuss the proposed amendment to the letter of credit, PDVSA "was and remains ignorant" of the "role" of Advanced Engineering. Gonzalez Aff., ¶ 64.

This statement is belied by PDVSA's own evidence. On November 3, 2006, Intrakam furnished to PDVSA a written purchase order for the cargo from Dynoil LLC. This document is submitted by PDVSA as Gonzalez Exh. 30, which is an e-mail to Mr. Gonzalez, Ms. Silva and others at PDVSA, with the Dynoil order attached. That order explicitly identifies the "End Seller" of the cargo as "Advanced Engineering Development LTD / Intracam S.A. de C.V.", and identifies PDVSA as the "Seller (Supplier)". The purchase order further states: "Advanced

2

Engineering Development LTD / Intracam S.A. de C.V. and/or PDVSA is . . . fully authorized to proceed with a soft probe of our financial capability contacting our bank officer." Thus, PDVSA well knew that Advanced Engineering had a business relationship with Intrakam and was acting to sell this cargo.

In this context, the claim that Mr. Gonzalez was ignorant of Advanced Engineering's position, when the November 15 conference call was held with Musket to discuss the letter of credit, rings hollow. Mr. Gonzalez avers that the call involved PDVSA, Intrakam, Musket and Advanced Engineering. Gonzalez Aff. ¶ 64. Mr. Gonzalez sent an e-mail following this call to the foregoing participants (Gonzalez Exh. 48).[2] This e-mail confirms that PDVSA lulled Musket into the belief that the sale of this cargo to Musket, by the parties participating, was fully authorized by PDVSA. The e-mail opens by "confirming" that, as stated during the conference call held earlier that day, PDVSA needed a change in the form of Musket's letter of credit, because Intrakam is the "actual direct buyer and responsible for paying before PDVSA" -- phrases that do not have any commonly-understood meaning. He continues with words intended to assure Musket that the requested change was standard operating procedure and was a mere formality. He states that the requested LOC wording is "commonly practiced"; that the wording "protects all parts [sic; parties] involved;" and that, with this change, "Intrakam would be the only company responsible for any legal claim under the supplying contract and under the warranty and/or letter of credit . . . ." Although these words are confusing in hindsight (since PDVSA now looks to Musket, not Intrakam, for payment), clearly they were meant to induce Musket to proceed with the purchase in the formal manner requested by PDVSA, at a time when

---

[2] A copy of this e-mail was submitted as Exhibit 7 to the Affidavit of Ravi Ramdas sown to January 15, 2007, in support of the motion to confirm the Attachment Order.

3

PDVSA knew that Advanced Engineering, which participated in the telephone call and received a copy of the e-mail, was acting to sell the cargo.

In the e-mail, Mr. Gonzalez also refers to Musket as PDVSA's "customer" (*i.e.*, stating that this LOC wording is "commonly practiced in PDVSA with our customers"). He closes the e-mail by expressing the hope that the "problem can be solved as soon as possible since we both intend to keep on building up our business relationship in the future."

PDVSA obviously knew of Advanced Engineering's role in this transaction, yet it now hides behind the carefully-worded claim that no one on that call "asked" Mr. Gonzalez, or any other PDVSA representative participating in the call, about Advanced Engineering's role. Gonzalez Aff. ¶ 65. The reason is obvious: everyone already knew that Advanced Engineering was selling the cargo with PDVSA's imprimatur. There is no suggestion that Advanced Engineering was acting for any other party, and it certainly was not acting for Musket.

## ARGUMENT

### I. There Is Sufficient Evidence That Advanced Engineering Had Apparent Authority To Act For PDVSA, To Support An Attachment Order Based On Breach Of Contract.

Contrary to Mr. Gonzalez's suggestion, he and PDVSA were well aware of Advanced Engineering's role in this transaction. Evidence such as the proposed contract between Dynoil and Advanced demonstrates that PDVSA knew that Advanced was selling this cargo to Musket, just as they were attempting to sell it to Dynoil shortly beforehand.

Furthermore, Musket, Advanced, Intrakam and PDVSA participated in two telephone conferences between November 10 and November 15, 2006, and PDVSA did not state that Advanced was not authorized to act for it. *See* Reply Affidavit of Ravi Ramdas. Moreover, as

4

shown above, the November 15 e-mail from Mr. Gonzalez at a minimum created the impression that Advanced Engineering was authorized to sell the cargo.

In these circumstances, PDVSA's silence constitutes an affirmation of Advanced Engineering's apparent authority to act for it. *See, e.g., Trustees Of the Am. Fed'n of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.,* 40 F. Supp. 2d 503, 511 (S.D.N.Y. 1999) ("silence may be construed as an affirmation of . . . apparent authority.") (citations omitted).

Moreover, even if, *arguendo,* Advanced was not authorized to act for PDVSA, PDVSA's acceptance of the contract made by Advanced constitutes an affirmance thereof. *See Restatement (2d) Agency* § 94, "Failure To Act As Affirmance" ("An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it."). Comment a to this section states, in part:

> Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent can be inferred. Such inference may be made although the purported principal had no knowledge that the other party would rely upon the supposed authority of the agent; his knowledge of such fact, however, coupled with his silence, would ordinarily justify an inference of assent by him.

*J.M. Heinike Associates, Inc. v. McCombs,* 83 A.D.2d 751, 443 N.Y.S.2d 512 (4th Dep't 1981), is instructive. In that case, plaintiff commenced an action against defendant McCombs, the president of Chili Lumber ("Chili"), to collect payments arising out of sales that plaintiff made to Chili. The transaction commenced when Chili's manager, Taft, called plaintiff's president, Heinike, to place an order for lumber. Heinike responded that plaintiff would sell the lumber to Chili only if the sales were made to Chili and McCombs jointly and severally. 443

5

N.Y.S.2d at 512. Taft consented to this arrangement, and over the next three years, sales were made in accordance therewith. *Id.*

Chili eventually became insolvent, and two checks that it issued to plaintiff were returned due to insufficient funds. Plaintiff then commenced an action against McCombs based upon Heinike's agreement with Taft that the sales were made to Chili and McCombs jointly and severally. *Id.* at 513. The court ruled for plaintiff, and the Fourth Department affirmed, holding:

> [T]he trial court found . . . that McCombs had personal knowledge of the exact nature of the transactions and "did nothing to alert the plaintiff to the fact that he was not responsible for the payment of the indebtedness." Those findings . . . provide an adequate basis for invoking the doctrine of ratification under which a party is held liable as a principal as a result of his affirmance of an act done by on who purports to be acting for the ratifier. It is not necessary that the person acting be the agent of the ratifier, and affirmance may be inferred from silence, when in the normal course of affairs, one who does not wish to consent would speak out.

*Id.* (internal citations omitted). *See also Alicia Ocean Transp., S.A. v. Rollins Burdick Hunter*, 621 F. Supp. 479, 482 (S.D.N.Y. 1985) (citations omitted) (ship owner sued insurance broker that had paid policy proceeds to the ship owner's former agent after an insured loss occurred; ship owner knew that former agent was collecting insurance proceeds from broker, and permitted the former agent to hold itself out to the broker as plaintiff's agent; these circumstances created apparent authority of the former agent to act on plaintiff's behalf).

Based on the earlier Dynoil purchase order, PDVSA knew that Advanced Engineering was selling this cargo. PDVSA permitted Advanced to enter into the contract with Musket, from which PDVSA benefited. As in the *J.M. Heinike* case, PDVSA had the opportunity to repudiate Advanced's authority to sell the cargo, but failed to do so. Accordingly, PDVSA is bound.

6

## II. Musket Did Not Agree, After The Fact, To Pay The Amount Claimed By PDVSA.

Maria Silva, an analyst in PDVSA's letter of credit department, claims that Musket's treasurer, Betty Proudfoot, stated that "Musket would pay to PDVSA the amount stated on Advanced Engineering's invoice and that PDVSA could collect the balance due under PDVSA's invoice to Intrakam from the letter of credit." Silva Decl. ¶ 20. This is not true. Ms. Proudfoot never stated that PDVSA could draw down on the LOC with respect to amounts that Intrakam allegedly owed PDVSA. Proudfoot Aff. ¶ 2. Rather, Ms. Proudfoot stated that Musket was responsible for paying the amount that it was invoiced pursuant to its contract with Advanced Engineering and that it would not pay any further sums. Under no circumstances would Musket permit PDVSA to draw down on the LOC with respect to amounts allegedly owed by Intrakam, because Musket posted the LOC solely to secure its own obligations. *Id.*

## III. PDVSA Has Made No Showing That It Has Assets In The Jurisdiction That Might Satisfy A Judgment.

PDVSA asserts, in a very brief point, that there is no need to continue the levy because "Musket already has found its way to PDVSA's bank account." Deft's Mem. at 24. This argument is somewhat disingenuous and it does not squarely meet the point at issue. Although PDVSA's bank account is identified in Musket's contract with Advanced Engineering (Compl., Exh. 1), Musket has no idea whether that account holds any funds.[3] In opposing the present motion, PDVSA has not revealed what funds it maintains in that New York account, nor has it identified <u>any</u> assets that it holds in New York, let alone non-moveable assets that would be sufficient to secure a judgment. Accordingly, attachment remains necessary to secure a judgment. *See DIC Animation City, Inc. v. McNaught Syndicate, Inc.*, No. 92-CV-4859 (CSH),

---

[3] The attached funds are not in PDVSA's New York account, but have been transferred by the garnishee, JPMorgan Chase, with the parties' consent, to the registry of the Court.

7

1993 WL 535064 (S.D.N.Y. Dec. 21, 1993), at *3 (need for attachment order, or to continue an attachment, turns on whether the non-domiciliary defendant "has sufficient [non-moveable] assets in New York to satisfy" a judgment, such as real property or wages subject to garnishment; because the defendant made no showing of having any such assets, an attachment order was entered).

## CONCLUSION

Based on the foregoing, and on the papers previously filed, plaintiff respectfully requests that the Court confirm the Attachment Order.

Dated:  New York, New York
        March 1, 2007

                                Respectfully submitted,

                                HOLLAND & KNIGHT LLP
                                Attorneys for Plaintiff

                                By: _____
                                    John J. Reilly (JR 9031)
                                   David D. Howe (DH 6201)
                                195 Broadway
                                New York, New York 10007
                                (212) 513-3200

Of counsel:
Richard J. Pelliccio