```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MUSKET CORPORATION,                 :
                                    :
              Plaintiff,            :    06 Civ 15522 (VM)
                                    :
         - against -                :    DECISION AND ORDER
                                    :
PDVSA PETROLEO, S.A., a/k/a PDVSA   :
PETROLEO Y GAS, S.A., and ADVANCED  :
ENGINEERING DEVELOPMENT LTD.,       :
                                    :
              Defendants.           :
------------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

On December 28, 2006, Plaintiff Musket Corporation ("Musket") applied for and obtained from this Court an <u>ex parte</u> order of attachment (the "Order"), pursuant to Rule 64 of the Federal Rules of Civil Procedure and § 6211(b) of New York Civil Practice Law and Rules ("CPLR"). On January 16, 2007, Musket served and filed a motion to confirm the Order to funds now held by the Clerk of Court. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.

### I. BACKGROUND[1]

Musket is an Oklahoma corporation. PDVSA Petoleo, S.A., a/k/a PDVSA Petroleo Y Gas, S.A. ("PDVSA") is a state-owned

---

[1] The factual recitation and contentions set forth below are drawn from the Complaint dated Dec. 10, 2006 (the "Complaint"), the Affidavit of Ravi Ramdas in Support of the Motion to Confirm the Order of Attachment dated Jan. 15, 2007 ("Ramdas Aff."), the Memorandum of Law in Support of the Motion to Confirm the Order of Attachment dated Jan. 16, 2007 ("Pl.'s Mem."), the Affidavit of Gilmer G. González in Opposition to Motion to Confirm Attachment, dated February 1, 2007, ("González Aff."), the Reply Memorandum of Law in Support of the Motion to Confirm the Order of Attachment dated Mar. 1, 2007 ("Pl.'s Reply"), and the Reply Affidavit of Ravi Ramdas in Support of the Motion to Confirm the Order of Attachment dated Mar. 1, 2007 ("Ramdas Aff. 2").

corporation, domiciled in Caracas, Venezuela. Advanced Engineering Development Ltd. ("Advanced") is a Spanish corporation, having its principal place of business in Malaga, Spain.

A.   THE ADVANCED-MUSKET AGREEMENT

On or about November 14, 2006, Musket entered into an agreement with Advanced to purchase 35,708 metric tons of diesel oil (the "Advanced-Musket Agreement"), to be shipped from Venezuela[2] by the vessel, Team Aniara, for a purchase price of $17,933,192.57. Pursuant to the Advanced-Musket Agreement, Musket was required to pay PDVSA by wire transfer to a bank account in New York, after receiving the diesel oil shipment from Advanced.[3] The contract also required that

---

[2] The ultimate destination of the cargo was Antwerp, Belgium, but PDVSA claims that its understanding was that the diesel oil was to be sent to Houston.

[3] The specific language of the contract reads: "All payments shall be in US Dollars against a Standby Letter of Credit to PDVSA Petroleo S.A., within three (3) banking days after the latter of (i) confirmation of compliance with contractual specifications; (ii) discharge of the Commodity; and (iii) confirmation of the quantity in receiving shore tank of Commodity at discharge port, as follows:

A.   Issued to:
     PDVSA PETROLEO S.A.
     JP MORGAN CHASE NEW YORK N.Y.
     270 Park Av. New York 10172

                    *       *       *

B.   Letter of Credit payable at sight of documents 25 days from BL date. Confirmed by Credit Suisse, Issued to:
     ADVANCED ENGINEERING DEVELOPMENT LTD.
     CREDIT SUISSE FIRST BOSTON
     17 RUE DE LAUSANNE
     CH- 1211 GENEVA 70

2

Musket secure its payment obligation to PDVSA; Musket did so by way of a letter of credit issued by JPMorgan Chase Bank, N.A. on November 14, 2006 (the "Letter of Credit").

Shortly after the Letter of Credit was prepared, a PDVSA representative e-mailed Musket, Advanced, and Intrakam SA de CV ("Intrakam"), an entity that Musket believed to be acting as an agent or broker of PDVSA in diesel oil sales to private, foreign entities. By way of the November 15, 2006 e-mail, PDVSA requested that the Letter of Credit be amended to state that Musket would pay PDVSA "on behalf of the company Intrakam, S.A." Musket agreed to this change to the Letter of Credit.

B.   THE PDVSA-INTRAKAM AGREEMENT

PDVSA, however, understood this change to the Letter of Credit to have been made pursuant to an October 19, 2006 contract that it established with Intrakam only (the "PDVSA-Intrakam Agreement"), not the Advanced-Musket Agreement. That is, while the Advanced-Musket Agreement included language indicating that PDVSA was the third-party beneficiary of the Advanced-Musket Agreement, PDVSA claims to have never seen the Advanced-Musket Agreement and believed that the Letter of Credit was connected solely to its contract with Intrakam.

The PDVSA-Intrakam Agreement provided Intrakam, a registered PDVSA customer, with 240,000 barrels of gasoil,

plus or minus 10 percent on F.O.B. terms, meaning that title and risk passed from PDVSA, as seller, to Intrakam, as buyer. The PDVSA-Intrakam contract also required Intrakam to make a prepayment of the cargo's estimated value before it was loaded onto the vessel.[4] Intrakam, acting as a broker for PDVSA in that Intrakam sought targets for onward sales of PDVSA's diesel oil, failed to complete at least two such transactions. On November 10, 2006, Intrakam indicated to PDVSA that PDVSA would be receiving a letter of credit to secure payment for the diesel barrels and to guarantee the demurrage that accrued for the vessel's additional waiting time in port due to the unsuccessful onward sales.[5]

---

[4] According the PDVSA-Intrakam Agreement, the clause indicating the need for prepayment denotes:

> THE PRODUCT DELIVERY HEREUNDER MUST BE PREPAID BY BUYER, BASED ON A PROVISIONAL INVOICE . . . ISSUED BY PDVSA, THREE (3) WORKING DAYS PRIOR TO THE FIRST DAY OF THE LOADING WINDOW, IN DOLLARS OF THE UNITED STATES OF AMERICA WITHOUT DISCOUNT, ALLOWANCE, RETENTION OR DEDUCTION, INCLUDING BANKING FEES OR WIRE TRANSFER FROM COMMERCIAL BANKS, INMEDIATELY [sic] AVAILABLE FUNDS OPENING BUSINESS INTO SELLERS ACCOUTN IN A BANK DESIGNATED BY SELLER.

González Aff., Exh. 1, cl. 7.

[5] Two very significant facts remain unclear to the Court from the papers submitted: how Musket initially became connected to Intrakam and to Advanced. The facts as presented by Musket begin with the contract that Musket established with Advanced on November 14, 2006, but there is no mention of: how Musket was contacted; whether Advanced or Intrakam made the initial contact; or whether there were negotiations or discussions prior to the execution of the Advanced-Musket Agreement.

Documentation from PDVSA indicates at least some contact between Musket and Intrakam either directly or by way of intermediary prior to the date of the Advanced-Musket Agreement. For example, PDVSA submitted an e-mail dated November 10, 2006 from Intrakam to PDVSA, indicating that it was in receipt of a letter of credit from Musket with the draft letter of credit attached. (See González Aff., Exh. 33.) It is not clear how Intrakam came to be in receipt of the draft letter of credit. Other open questions

4

From November 11 to November 13, 2006, PDVSA and Intrakam negotiated and outlined via e-mail the terms of the Letter of Credit to be issued by Musket, the purchaser, presumably located by Intrakam. After Musket issued the Letter of Credit on November 14, PDVSA advised Intrakam that it was not acceptable in its form on that date because it failed to identify the contract being secured; PDVSA indicated that it had no commercial relationship with Musket and that Intrakam was its only client in the transaction. PDVSA, Musket, Intrakam, and Advanced discussed the change during the November 15 conference call referred to above.

C.  THE AMENDED AGREEMENT

The diesel oil was purchased by Musket on an "as-delivered basis" (i.e., the seller, Advanced, pursuant to the Advanced-Musket Agreement, was responsible for the cost of shipping the cargo to the destination). However, while the diesel oil was in transit, Advanced requested that Musket advance the funds needed to pay the delivery vessel. Musket agreed to do so, with the understanding that the prepayment be credited to the purchase price. Musket and Advanced confirmed this amendment by modifying the Advanced-Musket Agreement (the

---

raised by the record include: Was Advanced involved in any of the discussions regarding the structure of the letter of credit? Why was Advanced not involved if Musket believed that Advanced was an agent of PDVSA? In light of these unresolved issues, the Court is unable to fully evaluate whether Musket's claim would be more likely than not to be successful on the merits.

"Amended Agreement"), with approximately $14,430,000 to paid to PDVSA; $1,309,000 to Advanced; and $2,191,000 to Team Tankers.[6] Advanced advised Musket that Musket did not need to contact PDVSA regarding the Amended Agreement and indicated that Advanced was acting with the full authority and knowledge of PDVSA.

The cargo was delivered on December 10, 2006. Musket has paid the full amount due to PDVSA, Advanced, and Team Tankers under the Amended Agreement. PDVSA initiated a draw-down on the Letter of Credit provided by Musket via JPMorgan Chase of over $1.5 million, which is roughly the difference between the amount paid to PDVSA by way of the PDVSA-Intrakam Agreement and the amount Musket paid to PDVSA by wire transfer on December 19, 2006, pursuant to the Amended Agreement.

## II.  DISCUSSION

### A.  STANDARD OF REVIEW

Rule 64 of the Federal Rules of Civil Procedure provides that the remedy of attachment is governed by state law. See Chem. Bank v. Haseotes, 13 F.3d 569, 572 (2d Cir. 1994). CPLR §§ 6211(b), 6212(a), and 6223(b) require that the party seeking to confirm an order of attachment bears the burden of establishing the grounds for the attachment, the need for

---

[6] The Advanced-Musket Agreement references the vessel "Team Aniara," while the Amended Agreement references "Team Tankers." See Compl., Exh. 3. In that neither party has identified a distinction between the two, the Court presumes that the names reference the same entity.

continuing the levy, and the probability for success on the merits. See Davila Pena v. Morgan, 149 F. Supp. 2d 91, 93 (S.D.N.Y. 2001). Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case. See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Baninvensa Capital Mkts., Ltd., No. 94 Civ. 2778, 1995 WL 380129, at *1 (S.D.N.Y. June 26, 1995); Donaldson Lufkin & Jenrette Secs. Corp. v. Burgess, No. 92 Civ. 1174, 1992 WL 47980, at *1 (S.D.N.Y. Mar. 2, 1992); Perrotta v. Giannoccaro, 532 N.Y.S.2d 998, 1000 (N.Y. Sup. Ct. 1988)(noting that the showing is comparable to that required when evaluating a preliminary injunction, "a clear showing of likelihood of ultimate success on the merits"). Section 6212(a) specifically requires that, "[o]n a motion for an order to confirm an order of attachment, the plaintiff shall show . . . that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." N.Y. C.P.L.R. § 6212(a) (McKinney 2006). Satisfaction of the statutory criteria, however, does not guarantee that a court will issue

such a relief. "[S]uch relief is discretionary, and since attachment is a harsh remedy, the court must exercise care in its application." Signal Capital Corp. v. Frank, 895 F. Supp. 62, 64 (S.D.N.Y. 1995).

CPLR § 6201, referenced above, provides, in relevant part, that an order of attachment "may be granted" in any action in which a money judgment is sought, where the defendant is: (1) a nondomiciliary residing outside of state or a foreign corporation not qualified to do business in New York; or (2) with intent to defraud his creditors or frustrate the enforcement of a judgment, has disposed of, encumbered or secreted property, or removed it from the state, or is about to do any of these acts.

B.   PROBABILITY OF SUCCESS ON THE MERITS

Musket asserts claims against PDVSA and Advanced for breach of contract and unjust enrichment (quasi-contract) and maintenance of the attachment requires that Musket indicate that is likely to succeed on the merits with respect to either allegation. In New York, the elements of a breach of contract claim are: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach." Wharton v. Duke Realty, LLP, 467 F. Supp. 2d 381, 393 (S.D.N.Y. 2006)(citing Marks v. New York Univ., 61 F. Supp. 2d

81, 88 (S.D.N.Y. 1999). "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish that (1) the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d Cir. 2006)(citing Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)). The chief weakness in Musket's claim regarding its likelihood of success for each cause of action rests with its claim of complete performance, i.e., whether Musket adequately compensated PDVSA (therefore benefitting PDVSA) pursuant to a mutual agreement.

    1.    Apparent Authority

Musket asserts that PDVSA consented to the change made pursuant to the Amended Agreement, which resulted in a decrease in the funds that PDVSA was to receive under the Advanced-Musket Agreement. (See Pl.'s Mem. at 3; Pl.'s Reply at 2-4.) In sum, Musket believed Advanced to be the agent of PDVSA, and more importantly, to have acted with the authority of PDVSA when Advanced requested the redistribution of funds so as to disburse the funds needed to pay the diesel oil carrier. PDVSA, however, claiming to have been a party only to the PDVSA-Intrakam Agreement, purports to have had no knowledge of the existence of the Advanced-Musket Agreement, nor of any subsequent alterations that were made to that

9

contract.

Under general principles of agency, both principal and agent must consent to the establishment of the agency relationship with each other. See Restatement (Third) of Agency § 1.01(d) (2006). A principal may be bound by the acts of an agent only if the agent acted with actual or apparent authority. See Heckler v. Cmty. Health Svcs. of Crawford Coutny, Inc., 467 U.S. 51, 64 n.21 (1984). Apparent authority originates from "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." Minskoff v. American Exp. Travel Related Svcs. Co., Inc., 98 F.3d 703,708 (2d Cir. 1996)(citing Restatement (Second) of Agency § 27 (1958)). Because the appearance of authority must be created by the principal, the agent "cannot confer authority upon himself or make himself an agent simply by saying that he is one." Karavos Compania Naviera S.A. v. Atlantica Export Corp., 588 F.2d 1, 10 (2d Cir. 1978).

PDVSA resists both the characterization of Advanced as its agent and the contention that its actions led Musket to believe that PDVSA consented to such a role for Advanced. Thus, PDVSA states, it did not consent to the Amended Agreement because Advanced was never acting on its behalf.

Moreover, PDVSA claims no knowledge of the Amended Agreement, nor of the Advanced-Musket Agreement, prior to the instant litigation. (See Def.'s Reply Mem. in Opp. to Motion to Confirm Attachment, dated February 2, 2007, ("Def.'s Reply Mem.") at 2-3.; see also González Aff., ¶¶ 2, 64-66, 73-74, 77.) On the record now before the Court, Musket's contention that Advanced was an agent of PDVSA, acting with apparent authority on behalf of PDVSA, is not borne out by the facts, and therefore Musket's breach of contract and quasi-contract claims against PDVSA are not more likely than not to succeed on the merits.

Musket claims that PDVSA's status as a third-party beneficiary of the Advanced-Musket Agreement establishes PDVSA's "awareness of the contract" and that Advanced acted as PDVSA's agent in "making the contract with Musket." (Pl.'s Mem. at 7.) However, Musket presents no clear evidence of PDVSA's knowledge of or consent to either the Advanced-Musket Agreement or the Amended Agreement. Musket cites two telephone conferences between November 10 and November 15, 2006 in which Musket, Advanced, Intrakam, and PDVSA participated, as well as a subsequent e-mail exchange discussing the call. (See Ramdas Aff., ¶¶ 12-13 and Exh. 7.)

Neither PDVSA nor Musket, however, clearly indicate how Advanced came to be a part of the transaction and therefore a

participant in the November 15 conference call and a recipient of the subsequent e-mail.  Based on the documentation from PDVSA, it appears that Intrakam alone located Musket as the target of the onward sale.  It could also be the case that Intrakam was steered to Musket by Advanced or that Intrakam brought Advanced into the transaction to spread a portion of the risk and costs involved.  With insufficient information on this important point, the record before the Court offers, at best, a murky sense at best of how and when Advanced came to be involved, if at all, with PDVSA or Intrakam.

The timeline established by PDVSA's submissions, therefore, could support its belief that the Letter of Credit was established pursuant to the PDVSA-Intrakam Agreement, not the Advanced-Musket Agreement.  From November 10-13, 2006, PDVSA learned, presumably from Intrakam, that Intrakam had a buyer in place and began negotiations regarding the content and format of the Letter of Credit.  (<u>See</u> González Aff., Exhs. 33-39.)  The negotiations predated the estimated date of the Advanced-Musket Agreement, November 14, put forth by Musket, making it possible that PDVSA had only its agreement with Intrakam in mind during these negotiations.

It is possible that the Advanced-Musket Agreement was being informally discussed by PDVSA and/or Intrakam prior to its formal consummation on November 14.  Perhaps the two

12

agreements were being negotiated simultaneously, thus establishing parallel contract discussions, both of which may have been addressed during the November 15 conference call. On the record before the Court, there is no way of crediting Musket's version of the facts over that of PDVSA's.

PDVSA requested and specifically required that the Letter of Credit detail that Musket was making payment to PDVSA on behalf of Intrakam; PDVSA indicated to Musket that Intrakam was the "actual direct buyer for PDVSA" and "the entity responsible for paying PDVSA." (Ramdas Aff., Exh. 7.) PDVSA made no mention of Advanced either on the call or in the content of its e-mail. In short, PDVSA's request that Musket insert another party into the transaction, coupled with its extensive documentation following the conference call reiterating Intrakam's role as direct buyer and failure to mention Advanced at all, casts doubt on Musket's contention that PDVSA had certain knowledge of the Advanced-Musket Agreement and the Amended Agreement. (See González Aff., ¶¶ 64-70, Exhs. 48-51.)

Thus, Advanced's presence during two conference calls and inclusion among the list of e-mail recipients in a subsequent communication does not translate to PDVSA's acquiescence to Advanced acting as PDVSA's agent with apparent authority. Musket's claims of Advanced's authority require more explicit

conduct or definitive statements by PDVSA; neither is sufficiently present here. See Minskoff, 98 F.3d at 709 (inferring apparent authority where agent continued use of fraudulently obtained credit card for which the principal received monthly statements); Hidden-Brook Air, Inc. v. Thabet Aviation Intern, Inc., 241 F. Supp. 2d 246, 264 (establishing apparent authority where principal saw signed offer made on his behalf by agent, held agent out as his sole representative, and directed the other party to deal with his agent).

Further, all direct assurances relied upon by Musket to support its claim of apparent authority came only from Advanced. The Advanced-Musket Agreement identifies Advanced as an "Intrakam/PDVSA Operator," but this agreement was prepared by Advanced, with no indication, either by way of signature or affidavit, that PDVSA saw the agreement. (See Ramdas Aff. ¶ 7.) Advanced asked Musket to pay the delivery vessel's invoice and indicated that it would be credited toward the purchase price. (See id. ¶ 8.) Advanced prepared the Amended Agreement and assured Musket that it acted with full authority from PDVSA. (See id. ¶ 10.) The pattern of communication that emerges signals Advanced's efforts to convey its authority to act on behalf of PDVSA, but not express authority created by PDVSA through any contract, oral

14

statements, or conduct that Musket could reasonably have construed and relied upon as deriving from PDVSA. See Gumpert v. Bon Ami Co., 251 F.2d 735, 730 (2d Cir. 1958) ("It is axiomatic that such unauthorized representations of the agent are not a holding out by the principal and cannot be a basis for apparent authority."); Karavos, 588 F.2d at 10. Reliance on such statements is even less justified "where . . . plaintiffs failed to make reasonable inquires into the ostensible agent's actual authority." Morgold, Inc. v. ACA Galleries, Inc., 724 N.Y.S.2d 227, 228 (N.Y. App. Div., 2d Dep't 2001).

    2.   Silence or Acceptance of Contract as Consent

Musket alternatively argues that PDVSA did not state that Advanced was not authorized to act for it during those calls and that PDVSA's silence constitutes affirmation of the apparent authority of Advanced. A principal is estopped from denying the apparent authority of its agent when it remains "silent when he had the opportunity of speaking and when he knew or ought to have known that his silence would be relied upon, and that action would be taken or omitted which his statement of truth would prevent . . . ." Scientific Holding Co. v. Plessey, Inc., 510 F.2d 15, 25 (2d Cir. 1974)(citations omitted).

In this instance, PDVSA technically had an opportunity to

speak during the conference calls and by way of e-mail communication, but Musket puts forth no facts that reasonably support a finding that PDVSA knew or should have known that Advanced would have been perceived as PDVSA's agent and therefore provides scant evidence of PDVSA having known that its silence would be relied upon by Musket. It bears repeating that PDVSA believed it was receiving payment pursuant only to the PDVSA-Intrakam Agreement and the Letter of Credit to which Musket consented makes reference to the PDVSA-Intrakam Agreement as the "underlying transaction." (Ramdas Aff., Exh. 6.) Musket has put forth insufficient documentation indicating that PDVSA knew of either iteration of the contract between Advanced and Musket.

Finally, Musket's arguments regarding acceptance of the Advanced-Musket Agreement as an indication of PDVSA's affirmance of Advanced as PDVSA's agent are inapplicable. Intrakam engaged in several unsuccessful efforts to find a buyer for the diesel oil that it had contracted to sell on behalf of PDVSA in order to pay PDVSA prior to its November 14, 2006 agreement with Musket. (See González Aff., ¶¶ 44-45, denoting at least two failed efforts by Intrakam to obtain buyers.) One of the potential buyers was a company named Dynoil, LLC, on which Advanced/Intrakam are listed as "End Sellers" of the cargo and PDVSA is identified as the "Seller"

(the "Dynoil Purchase Order"). (See id., Exh. 30.) The purchase order further states, "Advanced Engineering Development LTD/Intracam S.A. de C.V. and/or PDVSA is by means of this [Irrevocable Corporate Purchase Order] fully authorized to proceed with a soft probe of our financial capability contacting our bank officer." (Id.)

First, the Dynoil Purchase Order does not relate to the Advanced-Musket Agreement and is an entirely separate transaction that did not fully materialize. PDVSA does not claim that it never heard of Advanced, but rather that it did not know of the role of Advanced with respect to PDVSA's agreement with Intrakam. Moreover, the language of the Dynoil Purchase Order indicates a purported relationship between Intrakam and Advanced, but is ambiguous as to Dynoil's relationship with Advanced, i.e., if PDVSA were attempting to extrapolate what Advanced's relationship was with Musket, it is unclear what conclusion would be drawn from the language of the purchase order. Without more information regarding what PDVSA knew or did with respect to the Advanced-Musket Agreement, the Dynoil Purchase Order offers little support to Musket's claim that Advanced was PDVSA's agent.[7]

---

[7] It is unclear why PDVSA did not query the role of Advanced during its two conference calls, nor inquire as to why it was included in e-mail communications. Equally unclear is why Musket accepted, with little investigation, the word of Advanced with respect to its relationship to PDVSA. Both of these questions present situations that might have been easily resolved had either Musket or PDVSA asked what appear to be fairly

17

### III. SUMMARY

Having concluded that Musket's probability of success on the merits with respect to its breach of contract and quasi-contract claims against PDVSA is not more likely than not on the record presently before the Court, Musket's motion to confirm the December 28, 2006 attachment is denied. The facts submitted by Musket are not, at this stage, indicative of any designation of Advanced as an agent by PDVSA, nor any of any showing of apparent authority sufficient to maintain the attachment. Accordingly, Musket is not more likely than not to prove on the merits that it adequately performed and thus fully benefitted PDVSA such that PDVSA's draw-down on the Letter of Credit would have been rendered a breach of contract.

### IV. ORDER

For the reasons state above, it is hereby

**ORDERED** that the motion (Docket No. 10) of Musket Corporation to confirm the attachment herein is DENIED with respect the funds held by the Clerk of Court pursuant to the Federal Rule of Civil Procedure 67, pending resolution of this motion.

---

basic questions regarding the roles of the parties involved in the transaction.

**SO ORDERED.**

Dated:   New York, New York
         26 September 2007

                                    _____
                                    Victor Marrero
                                    U.S.D.J